# In the United States Court of Federal Claims

BID PROTEST

No. 16-1038C

(Filed Under Seal: October 31, 2016 | Reissued: November 15, 2016)[*]

| | |
|---|---|
| PROFESSIONAL SERVICE INDUSTRIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, <br><br> Defendant, <br><br> and <br><br> GENEX SYSTEMS, LLC, <br><br> Defendant-Intervenor. | Keywords: Tucker Act; Bid Protest; Corrective Action; Agency Discretion; Reasonable Under the Circumstances. |

*Shaun C. Kennedy*, Oles Morrison Rinker & Baker LLP, Seattle, WA, for Plaintiff. *Adam K. Lasky* and *Sean P. Dowell*, Oles Morrison Rinker & Baker LLP, Of Counsel.

*Igor Helman*, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, with whom were *Douglas K. Mickle*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, for Defendant. *Adam Sleeter*, Senior Attorney Advisor, Federal Highway Administration, Office of the Chief Counsel, Department of Transportation, Of Counsel.

*Paul F. Khoury*, Wiley Rein LLP, Washington, DC, for Defendant-Intervenor. *Cara L. Lasley*, Wiley Rein LLP, Of Counsel.

---

[*] This Opinion was originally issued under seal on October 31, 2016, and the parties were given the opportunity to request redactions. In light of the suggested redactions, the opinion is now reissued, with redactions of potentially sensitive information indicated by brackets.

## OPINION AND ORDER

**KAPLAN, Judge.**

In a bid protest filed with the Government Accountability Office (GAO), the plaintiff in this case, Professional Service Industries, Inc. (PSI), successfully challenged the decision of the Federal Highway Administration (FHWA) to award a contract to the defendant-intervenor, Genex Systems, LLC (Genex). As described in greater detail below, the contract involved the performance of on-site and off-site engineering and technical services to support research activities at an FHWA structural testing facility. GAO agreed with PSI that the proposal submitted by Genex in response to the solicitation was not in compliance with technical evaluation criteria requiring that the Program Manager (PM), who would be responsible for overseeing the contract, possess certain management experience.

In its complaint before this Court, PSI challenges the corrective action that FHWA took in the wake of GAO's decision. PSI alleges that it was arbitrary, capricious, an abuse of discretion, and contrary to law for FHWA to amend the solicitation to change the duties and required qualifications for the PM and to re-solicit proposals, rather than conducting a re-evaluation of the proposals under the un-amended solicitation's criteria.

Now before the Court are the parties' cross-motions for judgment on the administrative record. For the reasons set forth below, PSI's motion for judgment on the administrative record is **GRANTED**, and the government's and Genex's cross-motions are **DENIED**. Further, the government is enjoined from using the amended solicitation criteria to determine the contract award.

## BACKGROUND

### I.    The Initial Solicitation

PSI is a corporation with its principal place of business in Illinois. Compl. ¶ 13. It is the incumbent contractor providing laboratory support services for the structures research laboratories at FHWA's Turner-Fairbanks Highway Research Center (TFHRC). See Compl. ¶¶ 1, 3, 13.[1] On June 15, 2015, FHWA issued Solicitation No. DTFH61-15-R-00023, seeking proposals for a new contract to supply such services. Compl. ¶ 3; see also AR Tab 9 at 43 (acquisition plan). The solicitation was for a five-year Indefinite Delivery/Indefinite Quantity contract with a minimum order value of $50,000 and a contract ceiling of $18,000,000. AR Tab 17 at 83, 102.

---

[1] The structures research laboratories "support FHWA's strategic focus on improving mobility through analytical and experimental studies to determine the behavior of bridge systems under typical and extreme loading conditions." Administrative Record (AR) Tab 17 at 91. These labs also "provide bridge failure forensic investigation services . . . . [to] determine the causes of bridge structural failures and develop practices and procedures to help avoid similar failures from occurring in the future." Id.

Pursuant to the solicitation, FHWA would evaluate proposals by assessing price and non-price factors to determine the best value to the government. Id. at 152. The evaluation consisted of technical, past performance, and cost/price factors. Id. at 152–53. The technical factor was designated more important than past performance, and together those two factors were approximately equal to price. Id. at 153. Additionally, there was a small business subcontracting plan evaluation factor, but it was not weighted. Id.

The solicitation included staffing requirements, most pertinently those governing the PM position, which was the only position included in the category of "Key Personnel." Id. at 83–84, 135–36. The PM's duties were specified in section B.4.1 of the solicitation. Id. at 83–84. It stated as follows:

> The PM shall be responsible for oversight of all work under this contract. The PM shall assure that the requirements of the contract are met and shall be responsible for all aspects of contract performance. The PM shall be responsible for determining staffing needs, providing and supervising personnel, and determining man-hour and hard cost requirements of all task orders under this contract. The [PM] shall serve as the primary point of contact for the Contracting Officer's Representative (COR) and shall be responsible for responding to any task orders and technical directives and for the submission of progress reports. The [PM] shall be responsive to the government's need for excellent communication and quality customer service. The PM shall also be responsible for the preparation of all reports, papers, and presentations produced under this contract. The PM is not required to work on-site at TFHRC and may delegate on-site management of personnel and report preparation to a Metals Research Engineer or Concrete Research Engineer. Ultimately, the [PM] appointed by the Contractor shall be responsible for all contractor personnel issues including ensuring appropriate staffing levels and effort, performance appraisals, time and attendance, disciplinary actions, and quality of work.

Id.

The solicitation also listed the required qualifications for proposed PMs:

> The PM shall have, at a minimum, a Master's degree in Civil/Structural. In addition to the program management, the [PM] shall demonstrate knowledge in at least one of the following[]: 1) Concrete Structures; 2) Concrete Materials; 3) Steel Structures; or 4) Bridge Engineering. The PM shall have demonstrated experience managing structural testing facilities and directing a diverse team of researchers and technicians.

Id. at 84.

Offerors were required to submit detailed resumes for their proposed PMs, to include their academic background, technical qualifications, project management experience, subject matter expertise, relevant project level experience, and professional affiliations, licenses, designations, or national committee appointments. See id. at 145–46. Section B of the solicitation specified that the contractor would be required to "provide staff with the stated minimum qualifications, [or] else provide the necessary training." Id. at 90 (emphasis in original omitted).

## II.     The Proposals

FHWA received two proposals, one from PSI and one from Genex. Compl. ¶ 35; see also AR Tabs 24–26. In its proposal, PSI designated its incumbent PM, [ . . . ], as the proposed PM for the new solicitation. AR Tab 24 at 214. [ . . . ] had served as PSI's PM at the facility for more than sixteen years. Id.

Genex put forth [ . . . ] as its proposed PM. Id. Tab 26 at 355. [ . . . ] was then serving with PSI as a "lead engineer" at the TFHRC, with duties that included "coordinating efforts of peer engineers and train[ing] and supervis[ing] technicians in performance testing and other project-related duties." See id. at 382. Genex's proposal also stated that [ . . . ] had "[d]eveloped project plans for engineering research [and] developed cost estimates [and] project schedules" and that he "oversaw the procurement of materials and equipment required to conduct research projects." Id. In its "Master Staffing Matrix," Genex did not list any supervisory or personnel-related experience or credentials for [ . . . ]. See id. at 376.[2]

## III.     The Technical Evaluation and Initial Award

FHWA assigned a Technical Evaluation Team (TET) to review the proposals. The TET was composed of three members: Fassil Beshah, its chair, Benjamin Graybeal, and Justin Ocel. Id. Tab 27 at 388. In a consensus report issued in September 2015, the TET concluded that "there was not a significant difference in the technical merits of the two proposals," and recommended that the two proposals "be judged equally as 'Satisfactory' from the technical evaluation standpoint." Id. at 387, 389.[3]

---

[2] PSI's proposal also listed [ . . . ] as a member of its staff, but as a Concrete Research Engineer Level 3, not the proposed PM. AR Tab 24 at 214. The solicitation provided that a Concrete Research Engineer Level 3 must have a masters of science or doctorate in civil, mechanical, structural or bridge engineering, basic lab experience, a thesis or dissertation in concrete structures and/or materials, and at least three years of hands-on experience planning, conducting, and reporting on bridge engineering research. Id. Tab 17 at 86. The solicitation did not include any supervisory or management experience as part of the position's description or requirements. Id.

[3] An adjectival rating of "satisfactory" means the proposal "meets all solicitation requirements and demonstrates an adequate understanding of the requirements but does not offer advantages to the Government over minimum solicitation requirements. [The p]roposal may contain

Although the TET gave satisfactory ratings to both proposals, it identified a weakness in Genex's proposal based on [ . . . ]'s lack of management experience, noting that "[t]he proposed PM has limited experience in many of the key roles that are covered by this position, particularly those related to personnel management." Id. at 391. On the other hand, the TET concluded that PSI's proposed PM represented a strength in its proposal, because there would be "continuity . . . provided by the incumbent [PM] . . . drawing on his long experience in this role." Id. at 394.

After the TET issued its report, FHWA initiated discussions with both PSI and Genex. See id. Tabs 31–32. Among other topics, the agency sought to discuss the qualifications, experience, and capabilities of Genex's proposed PM with Genex. Id. Tab 32 at 413. With PSI, FHWA sought to discuss the subject of "lack of onsite leadership and management," in addition to other unrelated topics. Id. Tab 31 at 412.

After FHWA held discussions with each party, both PSI and Genex submitted addenda to their proposals. See id. Tabs 33–34. PSI's addendum proposed to address issues regarding on-site leadership and management by continuing to have [ . . . ] make regular on-site visits and be available at the TFHRC upon request, and by designating one of PSI's most experienced on-site research engineers as "Coordinator of On-Site Personnel." Id. Tab 33 at 414–15.

In its addendum, Genex responded to concerns regarding [ . . . ]'s lack of management experience. Id. Tab 34 at 424–25. It explained that because the PM position was not a full-time job, it had concluded that the optimal approach would be to have a research engineer serve in a dual capacity as PM. Id. at 424. It emphasized that because he was also a research engineer, [ . . . ] would be on-site when performing PM duties. Id. Genex also asserted that [ . . . ] "already provides informal oversight" of the existing contract at TFHRC, "where he is well-regarded as a mentor and leader for the incumbent team of researchers and technicians." Id. It offered "[t]o mitigate the potential performance risk related to [ . . . ]'s lack of formal experience performing as PM for a program of this size" by having its president perform "corporate oversight" and by "mobiliz[ing] corporate support and resources as necessary to ensure successful program performance." Id. "Furthermore," according to Genex, [ . . . ] would "interface with other Genex PMs and senior managers," which would provide him with mentorship and give him the benefit of having "a network of support resources that he can rely on to validate his management decisions and activities." Id. at 425. Finally, Genex stated that it would "not let this program or [its] PM [] fail" and that "[i]f [Genex] determine[s] that the day-to-day technical responsibilities for [ . . . ] are too demanding, or that he is not able to successfully apply [Genex's] management approach, [Genex] will work closely with the government to restructure [its] organization without impacting performance to ensure the program's continued success." Id. at 425.

On October 14, 2015, the TET issued another consensus report after reviewing the respective addenda. Id. Tab 35 at 432–36. It concluded that the supplements PSI and Genex had supplied "provided additional clarity thus addressing some of the weaknesses and mitigating

_____

weaknesses as long as none are significant [and it r]epresents a low technical risk of unsuccessful contract performance." AR Tab 27 at 389.

some of the risks identified." <u>Id.</u> at 433. Both Genex and PSI maintained their satisfactory technical ratings in the second report. <u>Id.</u>

With respect to the concerns about [ . . . ]'s lack of management experience, the TET addendum report noted that Genex had stated its intent to provide corporate personnel and resources to the PM "in order to streamline the execution of his tasks and cover back office . . . functions that can be acceptably handled off-site." <u>Id.</u> at 434. It also highlighted that Genex was willing to offer mentoring to [ . . . ] and to restructure management "should the on-site execution prove to be less than desirable." <u>Id.</u> The TET concluded its discussion of the issue by stating that it "reiterates that, per the RFP, the PM is the responsible party; however, it is also recognized that an Offeror can create a support system around the PM so as to cover portions of the required duties and ensure successful[] delivery of the contracted services." <u>Id.</u>

On January 12, 2016, FHWA issued its Source Selection Decision Memorandum (SSDM), awarding the contract to Genex. <u>Id.</u> Tab 41. The SSDM noted that both Genex and PSI received satisfactory technical ratings. <u>Id.</u> at 495. It acknowledged the TET's concern about [ . . . ]'s qualifications to serve as PM, and it listed his "limited experience in many of the key roles handled by this defined position" as a weakness. <u>Id.</u> at 498–99. In particular, the SSDM noted that the documentation of [ . . . ]'s qualifications "do[es] not demonstrate past experience in handling 'personnel issues including ensuring appropriate staffing levels and effort, performance appraisals, time and attendance, disciplinary actions, and quality of work'" as required by the solicitation. <u>Id.</u> at 499 (quoting <u>id.</u> Tab 17 at 84). The SSDM also stated that the "[l]imited experience of [Genex's] proposed PM within [the] responsibilities of [the] defined position creates [a] risk of poor delivery until experience is gained." <u>Id.</u> at 500.

With respect to price, both offerors' proposals were below the independent government estimate. <u>See id.</u> at 502. Genex's price ([ . . . ]), in turn, was lower than PSI's ([ . . . ]). <u>Id.</u> at 501. On past performance, PSI received a rating of satisfactory while Genex received a rating of excellent. <u>Id.</u> at 503–04.

Ultimately, the source selection panel concluded that Genex's proposal, as supplemented with its addendum, "provided an adequate strategic plan that effectively addressed the panel's concerns" regarding [ . . . ]'s qualifications. <u>Id.</u> at 506. It further found that Genex's proposal "represents the best value to the Government" and that Genex should receive the contract award. <u>Id.</u>

## IV.    PSI's First GAO Protest

FHWA notified PSI of the award to Genex on February 2, 2016. <u>Id.</u> Tab 48 at 637. PSI filed a protest with GAO on February 10, 2016. <u>Id.</u> Tab 54 at 670; Compl. ¶ 41. PSI asserted that FHWA's determination that Genex's proposal was technically acceptable was improper because Genex's proposed PM failed to satisfy the minimum experience requirements listed in the solicitation. Compl. ¶ 42; <u>see also</u> AR Tab 54 at 670.

On March 4, 2016, FHWA advised GAO of its intent to take corrective action by cancelling the award to Genex and re-evaluating the qualifications of the proposed PMs. Compl. ¶ 43; AR Tab 58 at 877. GAO then dismissed PSI's protest as "academic" on March 8, 2016.

Compl. ¶ 44. And on March 15, 2016, FHWA issued a letter to Genex terminating the contract for convenience pursuant to FAR 52.249-2. AR Tab 66 at 890.

## V.     FHWA's Re-Evaluation and the Second Award Decision

To effect the corrective action, the contracting officer directed the TET to "[r]eview the proposed [PMs] . . . and explain how the proposed [PM] for each proposal meets the qualifications listed on pg. 4 of the solicitation," including but "not limited to the qualification specifying that 'the PM shall have demonstrated experience managing structural testing facilities and directing a diverse team of researchers and technicians.'" Id. Tab 67 at 891 (quoting id. Tab 17 at 84).

In response, the TET issued two reports: a majority report and a minority report. See id. Tabs 68–69. The majority report, issued on March 16, 2016, and titled "Addendum to Technical Evaluation Team Report," was signed by TET members Benjamin Graybeal and Justin Ocel, but not by the TET's chair, Fassil Beshah. Id. Tab 68 at 893. Mr. Beshah, as described below, issued a minority report. Id. Tab 69 at 896.

The majority report "acknowledge[d] that [ . . . ]'s experience . . . do[es] not speak directly to the last two evaluation criteria,"—i.e., the demonstrated experience managing a structural testing facility and directing a diverse team of researchers and technicians. Id. Tab 68 at 895. However, the majority concluded that "there is equal vagueness in the RFP language and absence of metrics to define 'managing structural testing facilities' and 'directing a diverse team.'" Id. (quoting id. Tab 17 at 84). It opined that [ . . . ]'s duties as a lead engineer required him to coordinate the efforts of research teams on individual projects and thus satisfied the requirement that he have experience "directing a diverse team of researchers and technicians." Id. The majority report also quoted a sentence from Genex's proposal, stating that "[ . . . ] has[] '[d]eveloped project plans for engineering research, developed cost estimates [and] project schedules and overs[een] the procurement of materials and equipment required to conduct research projects.'" Id. (internal emphasis and citation omitted). It concluded that this experience satisfied the requirement that the PM have "demonstrated experience managing structural testing facilities." Id.

Finally, the TET majority noted that it "certainly acknowledges [ . . . ]'s lack of experience as a formally identified PM as being a weakness of the proposal" and that it "considers this proposed PM as a risk associated with an award to Genex." Id. Nonetheless, the majority stated that "the TET's recognition of his capabilities as outlined in the proposal, their observation of [ . . . ]'s work demeanor on the existing lab support contract, and Genex's affirmation of '[]an empowered, corporate-backed local [PM] available for instant response to the COR[]' were deemed to collectively mitigate the risk to an acceptable level." Id. (quoting id. Tab 26 at 373).

TET chair Fassil Beshah issued a "Minority Technical Evaluation Report" on March 15, 2016. Id. Tab 69 at 896. In his report, Mr. Beshah took issue with the observation of TET members Graybeal and Ocel that the solicitation was "vague" with respect to the necessary experience and qualifications for the PM. Id. Mr. Beshah further stated that "[f]rankly [ . . . ]'s resume did not demonstrate either the necessary knowledge or PM experience to manage the

work." Id. at 897. "His experience," Mr. Beshah observed, "is limited to performing research work [on] one or two specific projects under task order." Id. Mr. Beshah further stated that this weakness, first identified in the original consensus TET report, was not appropriately addressed or cured by Genex's addendum. Id. The TET chair noted that Genex's proposal to provide [ . . . ] with corporate assistance was not responsive to the TET's concerns about [ . . . ]'s lack of demonstrated experience, and did not mitigate his concerns about [ . . . ]'s competence to perform the PM job. See id. He explained that the proposal still left the PM duties with [ . . . ] (who lacked the requisite experience) and further that the TET did not know anything about Genex's president's skills or experience. Id. Finally, he rejected as inaccurate the assertion in [ . . . ]'s resume that he oversaw the procurement of material and equipment to conduct his research projects because those duties were the responsibility of the current PM, [ . . . ]'s supervisor. Id. at 898.

On March 30, 2016, the source selection panel again decided to award the contract to Genex. Id. Tab 72 at 926, 946. In the second Source Selection Decision Memorandum (SSDM II), both Genex and PSI again received satisfactory technical ratings. Id. at 930. Although noting the mitigation strategy contained in Genex's addendum, the SSDM II again characterized Genex's proposal to "install[] a [PM] with limited experience in many of the key roles handled by this defined position" as a weakness. Id. at 934. It further noted that the "[l]imited experience of [the] proposed PM within [the] responsibilities of [the] defined position creates [a] risk of poor delivery until experience is gained." Id. at 935.

The SSDM II went on to acknowledge the disagreement within the TET "on whether the proposed Genex [PM] met the qualification requirements of the solicitation." Id. at 936. It noted that the majority TET report continued to identify Genex's proposed PM as a weakness and associated risk, but also that Genex's corporate support "mitigated the risk to an acceptable level." Id. The panel concluded that the "majority and minority reports read together provide information showing that the majority of the TET agrees that both proposed [PMs] meet the qualification requirements." Id. at 937. It found that Genex's offer of corporate support and oversight was an "approach provided for in the solicitation Section B where it states that the contractor 'shall provide staff with the stated minimum qualifications, else provide the necessary training.'" Id. Therefore, the panel again decided that Genex's proposal provided the best value to the government and that it should receive the contract award. Id. at 945–46.

## VI.   PSI's Second GAO Protest

On April 12, 2016, PSI filed a second protest before GAO. Id. Tab 79 at 1021; Compl. ¶ 60. PSI again asserted that FHWA had improperly determined that [ . . . ] met the minimum experience requirements for the PM position. AR Tab 79 at 1021; Compl. ¶ 61. PSI also filed two supplemental protests on other grounds not at issue before the Court. AR Tab 85 at 1257; see also Compl. at 14 n.1.

On July 21, 2016, GAO sustained PSI's protest as to the technical evaluation, concluding that "the record demonstrates that the proposed individual did not meet the minimum qualifications of the [PM] position." AR Tab 111 at 1447. GAO rejected FHWA's decision as unreasonable and instead credited the reasoning of the minority TET report as to [ . . . ]'s lack of qualifications to serve as PM. Id. at 1453. It found "that the [PM] proposed by Genex failed to

meet the solicitation's requirement for management experience," and that "while Genex proposed to provide additional oversight by another individual, this additional oversight does not meet the solicitation requirements." Id. at 1450. GAO continued that it could not "conclude that the agency's evaluation was reasonable" and that "the duties that Genex's proposed [PM] performed while running specific projects did not equate to the wide-ranging management responsibilities associated with being the [PM] for a structural testing facility." Id. at 1453.

Additionally, GAO found "no basis in the record to conclude that [the PM's] experience equates to 'directing a diverse team of researchers and technicians.'" Id. (quoting id. Tab 17 at 84). It also critiqued FHWA's reliance on Genex's proposal to conduct corporate oversight, noting that Genex's proposal "does not address whether Genex's proposed [PM] will be trained to eventually assume all of the [PM] duties." Id. at 1454. As a result, GAO stated, it did "not think that the [agency] reasonably concluded that Genex's approach was consistent with the requirements of the solicitation, or [its] exception to the minimum qualification requirements." Id. Accordingly, GAO recommended that FHWA "re[-]evaluate [the] proposals in accordance with the evaluation criteria set forth in the [solicitation]." Id. at 1457. Alternatively, GAO recommended that if FHWA concluded that the solicitation as written did not accurately reflect its needs, it should amend the solicitation, solicit revised proposals, and evaluate them. Id.

## VII.   The Corrective Action at Issue in this Case

In response to GAO's decision, FHWA advised GAO by letter of August 15, 2016, that it had decided to "amend[] the technical requirements for key personnel," "seek revised proposals from [PSI and Genex]," and "evaluate the revised proposals and issue a source selection decision based upon that evaluation." Id. Tab 114 at 1470. According to FHWA, it had reviewed GAO's decision and concluded that these actions were consistent with GAO's recommendations. Id.

On the same day, FHWA issued Amendment 002. Id. Tab 113 at 1460. This amendment materially changed the duties and qualifications of the PM position. Id. at 1460, 1462. The duties portion of the solicitation was changed to read as follows:[4]

> The PM shall be responsible for oversight of all work under this contract. The PM shall assure that the requirements of the contract are met and shall be responsible for all aspects of contract performance. The PM shall be responsible for determining staffing needs, providing and supervising **the work of** personnel~~, and determining man-hour and hard cost requirements of~~ for all task orders **issued** under this contract. The [PM] shall serve as the primary point of contact for the Contracting Officer's Representative (COR) and shall be responsible for responding to any task orders and technical directives and for the submission of progress reports. The [PM] shall be responsive to the government's need for excellent communication and quality customer service. The

---

[4] Struck-through text represents deletions from the original solicitation while bolded text represents additions from Amendment 002.

> PM shall also be responsible for the preparation of all reports, papers, and presentations produced under this contract. The PM ~~is not required to work on-site at TFHRC and may delegate on-site management of personnel and report preparation to a Metals Research Engineer or Concrete Research Engineer~~ **shall work on-site at TFHRC a minimum of 15 hours per week**. Ultimately, the [PM] appointed by the Contractor shall be responsible for all contractor personnel ~~issues~~ including ensuring appropriate staffing levels and effort, ~~performance appraisals, time and attendance, disciplinary actions,~~ and quality of work.

Id. at 1462. Amendment 002 also changed the qualifications for the PM, as follows:

> The PM shall have, at a minimum, a Master's degree in Civil/Structural **Engineering**. ~~In addition to the program management, the [PM] shall demonstrate knowledge~~ **The PM shall have specialized experience demonstrated** in at least one of the following: 1) Concrete Structures; 2) Concrete Materials; 3) Steel Structures; or 4) Bridge Engineering. The PM shall have demonstrated experience ~~managing structural testing facilities~~ **overseeing projects in a testing facility,** and ~~directing~~ **coordinating the efforts of** a diverse team of researchers and technicians.

Id. at 1463. Finally, Amendment 002 altered the "Note" section so that it read "[t]he contractor shall provide staff ~~with~~ **that meet or exceed** the stated minimum qualifications, **or** ~~else~~ provide ~~the necessary~~ training **and/or support to reduce associated performance risks where qualifications are lacking**." Id. at 1469.

## VIII.  This Action

On August 22, 2016, the day that proposals responsive to the amended solicitation were due to be submitted, PSI filed its complaint in this Court. ECF No. 1. It alleges one cause of action: that FHWA's issuance of Amendment 002 was arbitrary, capricious, an abuse of discretion, and contrary to law. Compl. ¶¶ 77–84. PSI seeks relief in the form of 1) a declaration that FHWA's decision to issue Amendment 002 was arbitrary, capricious, an abuse of discretion, and contrary to law; 2) a declaration that FHWA must re-evaluate the original proposals in accordance with the evaluation criteria of the original solicitation; and 3) a permanent injunction prohibiting FHWA from soliciting revised proposals under Amendment 002 and from making a new award decision based on the evaluation criteria of Amendment 002. Id. at 20–21.

On September 16, 2016, PSI filed its pending Motion for Judgment on the Administrative Record. ECF No. 23. Both the government and Genex filed cross-motions for judgment on the administrative record on September 30, 2016. ECF Nos. 25, 26. Oral argument was held on October 21, 2016.

**DISCUSSION**

## I.    Jurisdiction

The Court of Federal Claims has jurisdiction "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). "Procurement includes all stages of the process of acquiring property or services." Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1244 (Fed. Cir. 2010). A challenge to an agency's corrective action is subject to this Court's bid protest jurisdiction. See Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1381 (Fed. Cir. 2012).

To possess standing to bring a bid protest, a plaintiff must be an "interested party"—i.e., an actual or prospective bidder (or offeror) who possesses a direct economic interest in the matter. Sys. Application & Techs., Inc., 691 F.3d at 1382 (citing Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009)); see also Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013). An offeror has a direct economic interest if it suffered a competitive injury or prejudice as a result of the alleged error. Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002) (holding that "prejudice (or injury) is a necessary element of standing"); see also Weeks Marine, Inc., 575 F.3d at 1359.

The Court assumes well-pled allegations of error to be true for purposes of the standing inquiry. Square One Armoring Serv., Inc. v. United States, 123 Fed. Cl. 309, 323 (2015) (citing Digitalis Educ. Sols., Inc. v. United States, 97 Fed. Cl. 89, 94 (2011), aff'd, 664 F.3d 1380 (Fed. Cir. 2012)). In post-award protests, a plaintiff has standing where it would have had a "substantial chance" of winning the award "but for the alleged error in the procurement process." Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003); see also Weeks Marine, Inc., 575 F.3d at 1359; Rex Serv. Corp. v. United States, 448 F.3d 1305, 1308 (Fed. Cir. 2006). In a pre-award protest, the focus is on whether the protestor has demonstrated a non-trivial competitive injury which can be addressed by judicial relief. See Weeks Marine, Inc., 575 F.3d at 1361–62. Either way, as the court of appeals has explained, a "protest will, by its nature, dictate the necessary factors for a 'direct economic interest.'" Sys. Application & Techs., Inc., 691 F.3d at 1382.

This case is something of a hybrid for standing purposes in that PSI is both an actual offeror (with respect to the initial solicitation that was the subject of its successful GAO protest) and a prospective offeror (with respect to the new solicitation that it challenges in this case). But regardless of whether the Court applies the pre- or post-award standards set forth by the court of appeals, PSI has alleged a direct economic interest sufficient to confer standing upon it.

PSI was one of only two actual offerors on the original solicitation and under the GAO decision, the proposal of its only competitor—Genex—was not technically acceptable. But for the error PSI alleges—the agency's decision to amend the solicitation rather than simply re-evaluating both proposals under the existing solicitation—PSI had at least a substantial chance of receiving the award. For similar reasons, the agency's decision to amend the solicitation caused PSI a non-trivial competitive injury because it requires PSI to re-compete for an award that it had

a substantial chance of winning but for what it alleges was an improper corrective action. <u>Sys. Application & Techs., Inc.</u>, 691 F.3d at 1382 (observing that "[a]n arbitrary decision to take corrective action without adequate justification forces a winning contractor to participate in the process a second time and constitutes a competitive injury to that contractor").[5] This non-trivial competitive injury could be addressed by a court order enjoining FHWA from amending the solicitation.

In short, PSI has established that it is an "interested party" within the meaning of the statute. Therefore, this Court has jurisdiction to consider its protest against the corrective action at issue in this case.

## II.     Standards of Review

### A.     <u>Motions for Judgment on the Administrative Record</u>

Parties may move for judgment on the administrative record pursuant to Rules of the Court of Federal Claims (RCFC) 52.1. Pursuant to RCFC 52.1, the Court reviews an agency's procurement decision based on the administrative record. <u>Bannum, Inc. v. United States</u>, 404 F.3d 1346, 1353–54 (Fed. Cir. 2005). The court makes "factual findings under RCFC [52.1] from the record evidence as if it were conducting a trial on the record." <u>Id.</u> at 1357. Thus, "resolution of a motion respecting the administrative record is akin to an expedited trial on the paper record, and the Court must make fact findings where necessary." <u>Baird v. United States</u>, 77 Fed. Cl. 114, 116 (2007) (internal citation omitted). The Court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." <u>A&D Fire Prot., Inc. v. United States</u>, 72 Fed. Cl. 126, 131 (2006). Unlike a summary judgment proceeding, genuine issues of material fact will not foreclose judgment on the administrative record. <u>Bannum, Inc.</u>, 404 F.3d at 1356.

### B.     <u>Bid Protest Cases</u>

The court reviews challenges to procurement decisions under the same standards used to evaluate agency actions under the Administrative Procedure Act, 5 U.S.C. § 706. <u>See</u> 28 U.S.C. § 1491(b)(4) (stating that "[i]n any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5"). Thus, to successfully challenge an agency's procurement decision, a plaintiff must show that the agency's

---

[5] The government argues that the reasoning in <u>Systems Application and Technologies, Inc.</u> is inapplicable here: 1) because the plaintiff in that case (unlike PSI) had actually received the contract award before the agency ordered a re-competition; and 2) because in that case, unlike here, the awardee would have had to re-compete for a contract after its prices had been made public, thus putting it at a competitive disadvantage. Def.'s Mot. at 35–36. But while the government is correct that PSI never received the contract award, it is clear that if its allegations of error are correct, it would have had a substantial chance of doing so. Further, in <u>Systems Application</u>, the fact that the awardee had to re-compete for an award it had already won was treated as a harm separate and apart from the harm of having to re-compete after its prices were disclosed. 691 F.3d at 1382.

decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Bannum, Inc., 404 F.3d at 1351.

This "highly deferential" standard of review "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)). Thus, the Court cannot substitute its judgment for that of the agency. See Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (holding that as long as there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion" (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))). Instead, the Court's function is limited to "determin[ing] whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (quoting Latecoere Int'l, Inc. v. U.S. Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)); see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (court should review agency action to determine if the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action"). A disappointed offeror "bears a heavy burden" in attempting to show that a procuring agency's decision lacked a rational basis. Impresa Construzioni Geom., 238 F.3d at 1338.

## III.    FHWA's Corrective Action

In this case, in response to GAO's decision upholding PSI's protest, FHWA proposed to amend the solicitation to: 1) change the duties that the PM would be required to perform under the contract; 2) require the PM to spend at least fifteen hours per week on-site; 3) modify the qualifications and experience required of candidates for the position; and 4) allow offerors to meet the technical requirements by providing support to PMs who lacked the qualifications and experience required under the solicitation. See AR Tab 113. PSI points out that these changes had the effect of conforming the new solicitation to Genex's original proposal. See Pl.'s Mot. at 26–30. It argues that it was arbitrary, capricious, an abuse of discretion, and contrary to law for FHWA to implement this corrective action because amending the solicitation was not "narrowly targeted" to remedy the defect that GAO identified (which involved an evaluation error). Id. at 22–26. Second, according to PSI, the justification the agency has provided for amending the solicitation—that the original requirements for the PM position did not accurately reflect the agency's needs—is not supported by the record. Id. at 30–34.

The government and Genex, on the other hand, argue that PSI has articulated a standard of review of the agency's decision to take corrective action (requiring "narrow targeting") that is unduly restrictive. See Def.'s Mot. at 27–32; Def.-Int.'s Mot. at 6–7. They further argue that the agency's decision to amend the solicitation is consistent with GAO's recommendations, that there is sufficient support in the record for the agency's determination that the original solicitation did not accurately reflect its needs, and that the changes made were rationally related to the defects in the original solicitation. Def.'s Mot. at 18–26; Def.-Int.'s Mot. at 7–14.

The Court begins its analysis with PSI's proposed standard of review. It is well-established that "[a]s with all procurement decisions, an agency has broad discretion to take

necessary corrective action" where there has been an error in the procurement process. See Sys. Application & Techs., Inc., v. United States, 100 Fed. Cl. 687, 716 (2011), aff'd, 691 F.3d 1374 (Fed. Cir. 2012); see also Seaborn Health Care, Inc. v. United States, 55 Fed. Cl. 520, 527 (2003) (citing Omega World Travel, Inc. v. United States, 54 Fed. Cl. 570, 574 (2002)). Given the broad discretion afforded agencies in the bid protest arena, the great weight of authority is that to survive review, an agency's corrective action must be "'reasonable under the circumstances and appropriate to remedy the impropriety.'" Amazon Web Servs., Inc., v. United States, 113 Fed. Cl. 102, 115 (2013) (quoting Reema Consulting Servs., Inc. v. United States, 107 Fed. Cl. 519, 527 (2012)); see also Macaulay-Brown, Inc. v. United States, 125 Fed. Cl. 591, 602 (2016) ("In reviewing an agency's proposed corrective action, this court considers whether the corrective action is reasonable under the circumstances." (quotation and citations omitted)); Wildflower Int'l, Ltd. v. United States, 105 Fed. Cl. 362, 385–86 (2012) (same); Sheridan Corp. v. United States, 95 Fed. Cl. 141, 145 (2010) (stating that "[t]o be reasonable, the agency's corrective action must be rationally related to the defect to be corrected" and "the reason for the corrective action must be supported by the evidence in the record").

PSI argues nonetheless that the Court should apply a "narrow targeting" or "narrow tailoring" requirement to an agency's decision to take a particular corrective action. See Pl.'s Mot. at 22–26. This argument, however, is unpersuasive. Legal standards that impose narrow tailoring or narrow targeting requirements on government action are employed in cases where courts apply heightened scrutiny to such actions. See, e.g., Williams-Yulee v. Fla. Bar, 135 S. Ct. 1656, 1664 (2015) (under the First Amendment, laws restricting the solicitation of contributions to charity upheld "only if they are narrowly tailored to serve a compelling interest"); Grutter v. Bollinger, 539 U.S. 306, 326 (2003) (racial classifications are constitutional under the Equal Protection Clause "only if they are narrowly tailored to further compelling governmental interests"); Reno v. Flores, 507 U.S. 292, 305 (1993) (for purposes of substantive due process claims, "narrow tailoring is required only when fundamental rights are involved"). Because protested procurement actions are reviewed under a deferential reasonableness standard, it would not be appropriate to apply a narrow targeting or tailoring requirement to an agency's decision to take corrective action. Therefore, the Court will consider whether FHWA's corrective action was reasonable under the circumstances and whether it is supported by the administrative record.

In this case, the government contends that the corrective action that FHWA took was reasonable because it was among the two alternative recommended corrective actions that GAO suggested after it upheld PSI's protest. Def.'s Mot. at 18. Thus, GAO stated that if FHWA concluded that the original solicitation did not accurately reflect its needs, the agency could amend the solicitation and solicit new proposals, rather than re-evaluating the existing proposals under the original criteria. AR Tab 111 at 1457.

The government is correct that a procuring agency's decision to follow GAO's recommendation is proper, even where that recommendation differs from the contracting officer's initial decision, "unless [GAO's] decision itself was irrational." Centech Grp., Inc. v. United States, 554 F.3d 1029, 1039 (Fed. Cir. 2009) (quoting Honeywell, Inc., 870 F.2d at 648) (alteration in original); see also PricewaterhouseCoopers Pub. Sector, LLP v. United States, 126 Fed. Cl. 328, 352 (2016) (observing that "[g]enerally, an agency's decision to take corrective action in order to implement a GAO recommendation is proper unless the GAO decision itself is

irrational." (citing <u>Raytheon Co. v. United States</u>, 809 F.3d 590, 595–96 (Fed. Cir. 2015) and <u>Centech Grp., Inc.</u>, 554 F.3d at 1039)).

PSI does not claim, however, that GAO's recommendation was itself irrational or otherwise improper. <u>See</u> Pl.'s Mot. at 22–26. It contends instead that FHWA did not, in fact, follow GAO's recommendation when it amended the solicitation because there is nothing in the record to demonstrate that the agency ever made a determination that the original solicitation did not accurately reflect its needs. <u>Id.</u> at 30–34. Without such a determination, PSI argues, the corrective action was overbroad because, as a general matter, amending the solicitation and re-soliciting new proposals is not an appropriate action to address an error in the evaluation process. <u>See id.</u> at 23–26 (citing <u>Sheridan</u>, 95 Fed. Cl. at 153 (holding that where an agency's concern relates to how proposals were evaluated a re-solicitation of new proposals is not a rational corrective action)); <u>see also</u> <u>Amazon Web Servs., Inc.</u>, 113 Fed. Cl. at 115–16.

The Court agrees with PSI that the administrative record contains little, if any, evidence that FHWA conducted an assessment of its needs after GAO's decision. Further, even assuming that such an assessment occurred, the record does not supply sufficient evidence that it was reasonable for FHWA to conclude that the original requirements it set for the PM position (in terms of both the duties and qualifications) did not accurately reflect its needs.

First, the administrative record provides no explanation of FHWA's decision to change the PM's duties and qualifications. The sole "explanation" of FHWA's decision contained in the administrative record consists of two bullet points in the brief letter that FWHA sent to GAO after it decided to amend the solicitation rather than to re-evaluate the proposals of Genex and PSI under the existing solicitation. AR Tab 114 at 1470. In those two bullet points FHWA merely stated, without explanation, that it intended to 1) "amend[] the technical requirements for key personnel and . . . seek revised proposals from the two organizations that had submitted proposals under the solicitation" and 2) "evaluate the revised proposals and issue a source selection decision based upon that evaluation." <u>Id.</u>

This language establishes only that the agency made a decision to amend the technical requirements and to solicit and evaluate new proposals. But neither the letter to GAO nor any other document in the record reflects that the agency's decision to take these steps was based on any assessment of whether the duties and experiential requirements set forth in the original solicitation for the PM position accurately reflected the agency's needs. At most, one might infer that some assessment was conducted based on FHWA's conclusory statement in the letter that it had reviewed GAO's decision and believed that its corrective action was consistent with GAO's recommendation. But that inference alone is an inadequate basis for upholding the corrective action given the lack of other evidence in the record regarding FHWA's decision-making process.

Even assuming it is possible to infer that the agency evaluated whether reducing the PM's responsibilities and watering down the management experience requirements would better reflect its needs, there is nothing in the record—contemporaneous or otherwise—from which the Court can determine how the decision was made or what rationale supports it. While the Court agrees with the government that the agency is not required to "synthesize its thinking . . . into a prelitigation written explanation of the rationale for each of the solicitation's requirements,"

Def.'s Mot. at 25 (omission in original) (quoting Savantage Fin. Servs., Inc. v. United States, 595 F.3d 1282, 1287 (Fed. Cir. 2010)), it disagrees that the rationale for the changes the agency made "is apparent from, and supported by, the administrative record." Id.

The government contends that the record of the procurement itself shows that based on "the combination of the technical evaluations and the GAO decision . . . the agency realized that it needed to relax the [PM] qualification requirements specified in its original solicitation." Def.'s Reply at 3. Specifically, the government explains that at least two of the three TET members concluded during the process of evaluating Genex's proposal that "an offer proposing a less experienced [PM] would still satisfy the agency's needs." Id. It also observes that "the source selection authority twice concluded that a [PM] with lesser qualifications would still be technically acceptable for the lab, in light of additional assistance to mitigate the weaknesses from the lack of experience." Id.

First, the government's argument overlooks that the agency not only watered down the experience requirements for the PM position when it amended the solicitation, but that it also relieved the PM of certain critical management responsibilities, without transferring them to anyone else. These include the work of determining man-hour and hard cost requirements for task orders, preparing performance appraisals for laboratory staff, tracking their time and attendance, and taking disciplinary actions where appropriate. Compare AR Tab 17 at 83–84, with id. Tab 113 at 1462–63. There is nothing whatsoever in the record that reveals how an offeror under the amended solicitation will ensure performance of these critical management and supervisory functions, which are no longer the PM's responsibility. Yet under the solicitation as amended, the PM is still responsible "for oversight of all work under th[e] contract" and "for all aspects of contract performance," including "determining staffing needs" and "providing and supervising the work of personnel." Id. Tab 113 at 1462–63. On this record, therefore, it is not possible for the Court to determine whether the agency may have "entirely failed to consider an important aspect of the problem" when it changed the PM's duties. See Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43.

Further, the agency would have the Court infer that the original qualifications and experience required for the PM did not accurately reflect the agency's needs because two of the three TET members concluded (and the source selection panel concurred) that [ . . . ] could adequately perform the duties of the PM job (with corporate assistance). See Def.'s Reply at 3. Of course, the TET chair, who was also the contracting officer representative, apparently disagreed. AR Tab 69 at 896. Moreover, the fact that two members of the TET concluded that [ . . . ] could do the job does not necessarily mean that other potential PMs with a similar lack of management experience could also do so. Presumably the experience requirements for the PM position were originally determined on the basis of standards of general applicability—i.e., what kinds of duties must the PM perform and what experience should be required generally for individuals who perform those duties. The Court, therefore, declines to infer that the agency would have based an amendment of those requirements on its determination that a particular individual who was known to the TET members could serve as PM if the duties of the position were reduced and corporate oversight provided.

Additionally, the decision to water down the experience requirements for the PM appears to "run[] counter to the evidence before the agency." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43.

The record reveals that the TET identified risks and weaknesses in Genex's proposal because of [ . . . ]'s "limited experience in many of the key roles handled by this defined position." AR Tab 27 at 391–92. And the agency was concerned enough about [ . . . ]'s experience, qualifications, and capabilities that it engaged in discussions with Genex regarding those matters. Id. Tab 32 at 413. Further, even after PSI filed its first protest before GAO, FHWA did not amend the solicitation to change the requirements for the PM; instead, it directed the TET to re-evaluate the original proposals and explain how each PM candidate compared to the original solicitation's requirements. Id. Tab 67 at 891.

After the second protest, in which GAO sustained PSI's second challenge, FHWA issued Amendment 002, which changed the duties of the PM and watered down the qualification requirements for the position. See id. Tabs 113–14. Thus, as noted, under the revised solicitation, the PM is no longer responsible for determining man-hour and hard cost requirements of all task orders, nor is the PM responsible for performance appraisals, time and attendance, or disciplinary actions. Compare id. Tab 17 at 83–84, with id. Tab 113 at 1462–63. Additionally, under the revised solicitation, the PM no longer need demonstrate experience "managing structural testing facilities" and "directing a diverse team of researchers and technicians"; it is sufficient if he or she demonstrates experience "overseeing projects in a testing facility" and "coordinating the efforts of a diverse team of researchers and technicians." Compare id. Tab 17 at 83–84, with id. Tab 113 at 1462–63.

Presumably, the agency had good reasons for assigning the duties and qualifications it originally established for the PM. While an agency that changes its policy "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one" in order to survive review under the arbitrary and capricious standard, "a reasoned explanation is needed for disregarding facts and circumstances that underlay . . . the prior policy." See FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515–16 (2009) (emphasis in original). No such explanation is apparent or can be inferred on the basis of the present administrative record.

Perhaps most critically, it is of concern to the Court that the changes in responsibilities and qualifications that FHWA proposed have the effect of conforming the solicitation precisely to the experience and qualifications of Genex's proposed PM, [ . . . ]. Compare AR Tab 113 at 1462–63, with id. Tab 26 at 371–76; see also Pl.'s Mot. at 26–30. Similarly, the amendment of the solicitation to provide that the PM's lack of experience could be mitigated through either "training and/or support" also conforms the solicitation precisely to Genex's proposal to provide [ . . . ] with corporate support rather than management training. Compare AR Tab 113 at 1469, with id. Tab 17 at 90; see also id. Tab 34 at 424–25. And the new requirement that the PM spend at least fifteen hours per week on-site seems to dovetail with the fact that [ . . . ] (unlike PSI's current and proposed PM) is already required to be on-site to perform his research engineer duties. The agency's corrective action, in other words, gives the appearance of securing a result that is precisely the opposite of what the procurement rules ordinarily require. For rather than ensuring that an offeror's proposal conform strictly to the requirements of the solicitation, the agency has changed the solicitation to conform to an offeror's proposal.

To be clear, the Court does not find that FHWA's motives for revising the PM's duties and qualifications were necessarily improper. See ManTech Telecomms. & Info. Sys. Corp. v.

United States, 49 Fed. Cl. 57, 74–75 (2001), aff'd 30 Fed. App'x 995 (Fed. Cir. 2002) (per curiam) (observing that amendments to a solicitation must be made "in good faith, without the specific intent of changing a particular offeror's technical ranking or avoiding an award to a particular offeror" (quoting Federal Sec. Sys., Inc., B-281745.2, 99-1 CPD ¶ 86 (Comp. Gen. Apr. 29, 1999)), and that "[a]t the core of this standard" are "fairness concerns"—"in particular, the concern that an amendment not be used as a vehicle to steer a contract toward or away from a particular contractor"). To the contrary, the agency's decision to amend the solicitation is entitled to a presumption of regularity. Impresa Construzioni Geom., 238 F.3d at 1338. The Court also recognizes, as the government has argued, that an agency has "broad discretion to amend the solicitation when it determines that such action is necessary to ensure fair and impartial competition and to permit the government to obtain its minimum requirements at the most favorable price." Def.'s Mot. at 22 (quoting ManTech Telecomms. & Info. Sys. Corp., 49 Fed. Cl. at 73); see also PricewaterhouseCoopers Pub. Sector, LLP, 126 Fed. Cl. at 364 (observing that "[a]n agency's determination of the 'best method of accommodating its needs' . . . falls within the agency's discretion" (quoting CHE Consulting, Inc. v. United States, 74 Fed. Cl. 742, 747 (2006))).

Nonetheless, given the history of this procurement, the Court is disinclined to infer that the agency examined its needs and engaged in reasoned decision-making when it amended the requirements of its solicitation in a way that conformed them to a proposal of an offeror who did not meet the original solicitation's requirements. To rubber-stamp an agency's unexplained decision under these circumstances would be an abdication of the Court's review function (limited as it may be). See Demutiis v. United States, 48 Fed. Cl. 81, 87 (2000) (observing that "the Supreme Court has cautioned that a reviewing tribunal cannot permit itself to 'slip into a judicial inertia' or mechanistically 'rubber-stamp' the agency" (quoting Bureau of Alcohol, Tobacco & Firearms v. Fed. Labor Relations Auth., 464 U.S. 89, 97 (1983))), aff'd as modified, 291 F.3d 1373 (Fed. Cir. 2002).

In short, the record before the Court is devoid of evidence that the agency reviewed its needs, reasonably assessed them, and had a rational basis for deciding that the original solicitation did not meet them. Accordingly, FHWA's decision to amend the solicitation to reduce the responsibilities and water down the experience and qualifications required for the PM position is arbitrary and capricious and must be set aside.

## IV.    Prejudice

If agency action is determined to be in error, the court is required to analyze whether the error "in the procurement process significantly prejudiced" the plaintiff. Bannum, Inc., 404 F.3d at 1353. This is a factual question for which the movant must show a "'substantial chance' it would have received the contract award but for the errors" identified. Id. (citing Info. Tech. & Applications Corp., 316 F.3d at 1319, and Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999)). Alternatively, in the pre-award context, it must show that it suffered a competitive injury as a result of the error. See Distributed Sols., Inc. v. United States, 104 Fed. Cl. 368, 377–81 (2012).

Here, only two parties submitted responses to the solicitation: Genex and PSI. AR Tabs 24–26. Both were initially found technically acceptable by the TET. Id. Tab 27. GAO, however,

determined that Genex's PM did not meet the solicitation requirements. Id. Tab 111. Thus absent FHWA's error in amending the solicitation, PSI would likely be the only remaining technically acceptable offeror and would have a substantial chance of receiving the award upon re-evaluation. Further, if the agency's corrective action stands, PSI will be required to re-compete for an award which it otherwise had a substantial chance of winning. Therefore, PSI has demonstrated the requisite significant prejudice as a result of the agency's error.

## V.   Relief

In a bid protest case, the court is empowered to award any relief it considers proper, including declaratory and injunctive relief. 28 U.S.C. § 1491(b)(2). Here, PSI seeks 1) a declaration that the corrective action implemented by FHWA was arbitrary, capricious, an abuse of discretion, and contrary to law; 2) a permanent injunction prohibiting the agency from undertaking the corrective action set forth in Amendment 002; and 3) an injunction requiring the agency to re-evaluate the proposals consistent with the terms of the original solicitation. Pl.'s Mot. at 39–40.

"Injunctive relief is appropriate if it 'enjoin[s] the illegal action and return[s] the contract award process to the status quo ante.'" Turner Constr. Co. v. United States, 645 F.3d 1377, 1388 (Fed. Cir. 2011) (quoting Parcel 49C Ltd. P'ship v. United States, 31 F.3d 1147, 1153 (Fed. Cir. 1994)) (alterations in original). To decide whether an injunction should issue, the Court must determine 1) whether the movant has demonstrated success on the merits; 2) whether the movant will suffer irreparable harm if the injunction does not issue; 3) whether the balance of the hardships to the parties favors the grant of injunctive relief; and 4) whether the public interest is served by issuance of the injunction. Centech Grp., Inc., 554 F.3d at 1037.

The Court agrees that PSI is entitled to a permanent injunction prohibiting FHWA from going forward with re-soliciting and re-evaluating proposals under the amended solicitation. First, PSI has prevailed on the merits. Second, unless the agency's corrective action is enjoined, PSI faces irreparable harm from an unnecessary re-competition for a contract that it would likely have won under the existing solicitation because the proposal of its sole competitor, Genex, was technically unacceptable.

On the other hand, the Court finds unpersuasive the government's argument that it will be harmed if the Court issues a permanent injunction because that would somehow prevent FHWA from carrying out its "critical infrastructure mission." Def.'s Mot. at 38. Specifically, the government argues that if a permanent injunction were granted it would not be able to secure the contract at the lower price proposed by Genex. See id. But even if enjoining FHWA from moving ahead under the amended solicitation did result in it ultimately paying a higher price for the contract (a result which is by no means pre-ordained), there is nothing in the record, nor does logic suggest, that paying a higher price for this contract would somehow disable FHWA from carrying out its mission. To the contrary, FHWA's performance of its mission is promoted by ensuring that the contract is overseen by a PM who possesses the appropriate qualifications for their position. Finally, the public has an overriding interest in the fairness of the federal procurement process. Therefore, the balance of the equities supports an award of injunctive relief.

While the Court concludes that FHWA should be enjoined from proceeding with a competition under the amended solicitation, it declines to direct FHWA to re-evaluate the existing proposals submitted by Genex and PSI consistent with the terms of the original solicitation. First, it may be that FHWA could reasonably conclude, on the basis of a review of its requirements, that the original solicitation does not meet its needs. In that case, if the agency were to again amend the solicitation and accept new proposals, it would behoove it to document the basis for any amendment, so that it could defend the corrective action in the event of a subsequent protest by one of the parties.

Second, according to the government, changed circumstances exist that could support (or even require) that it solicit modified proposals even if it does not amend the original solicitation. Def.'s Reply at 9–11. It also argues that it might be affirmatively required to reopen discussions with Genex to raise concerns about [ . . . ]'s lack of qualifications under the original solicitation. Def.'s Reply at 10. Without deciding whether there exists an adequate basis for re-soliciting new proposals, the Court concludes that it would be imprudent to preclude the possibility that it would be appropriate or necessary for the government to give the parties the opportunity to modify their proposals in some respect, even if it went ahead with a re-evaluation under the original solicitation.

## CONCLUSION

For the foregoing reasons, PSI's motion for judgment on the administrative record is **GRANTED** and the government's and Genex's motions are **DENIED**. The proposed corrective action of issuing Amendment 002 and thereafter re-soliciting and re-evaluating proposals is arbitrary and capricious. PSI's request for injunctive relief prohibiting the use of Amendment 002 and evaluation thereunder is hereby **GRANTED**.

Wherefore, the United States and its officers, agents, servants, employees, representatives, and all other persons acting in concert with them with respect to the subject procurement are hereby **PERMANENTLY ENJOINED** from conducting a re-solicitation and re-evaluation pursuant to the revised criteria set forth in Amendment 002, as set out in FHWA's letter to GAO dated August 15, 2016 (AR Tab 114 at 1470). The Clerk of the Court is directed to enter judgment accordingly. Each party shall bear its own costs.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge